UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:10-CV-00146-JHM

**TIM PIERCE**                                                                                                          **PLAINTIFF**

**V.**

**LARRY BENNETT, in his personal capacity**
**as Sheriff, Russell County, Kentucky**                                                        **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Larry Bennett's Motion for Summary Judgment [DN 34] and Plaintiff Tim Pierce's Motion for Partial Summary Judgment [DN 35]. Fully briefed, this matter is ripe for decision. For the following reasons, the Court **GRANTS** the Defendant's motion and **DENIES** the Plaintiff's motion.

### I. BACKGROUND

The material facts at issue in this case are not heavily disputed. Defendant Larry Bennett has served as Sheriff of Russell County, Kentucky, continuously since his election to that office in 1990. (Compl. ¶ 10.) Defendant hired Plaintiff Tim Pierce as a Deputy Sheriff on June 6, 2004. (Id. at ¶ 8.) After Defendant won re-election in 2006, Plaintiff approached him and asked whether the Defendant anticipated running for re-election in 2010. (Tim Pierce Dep. 69:14-21.) Plaintiff testified at his deposition that Defendant said he did not think he would run for re-election again. (Id. at 19-21.) Defendant testified that after an election he is always tired and is unsure if he will run for office again, but that he has never told anyone that he would not run in the future. (Larry Bennett Dep. 26:15-27:2.) The exact content of what was said that day is not material, however, it is undisputed that following that conversation, Plaintiff began quietly campaigning for the office of Sheriff in the 2010 election. (Pl.'s Mem. in Supp. Mot. Partial Summ. J. 2 [DN 35].)

Neither party disputes that prior to the 2010 election, there was friction between certain Deputies within the Russell County Sheriff's Department. There are differing views on the cause of that friction. One view is that Deputy Clete McAninch and Plaintiff both desired to one day be the Sheriff. (Ooten Dep. 64:21-23.) Another proposed cause of friction was the failure of deputies to respond to calls in a timely manner or back-up one another on dangerous calls. Allegations of this type of behavior were alleged by Plaintiff and his supporters and by Defendant and his supporters. (See Bennet Dep. 44:23-45:2.) A third possible cause was an alleged verbal tirade by Plaintiff directed at Deputy McAninch in approximately 2005, witnessed by Deputy Bertram. (See Bertram Dep. 12:8-20, McAninch Dep. 11:2-8.) It is entirely possible and likely that each one of these issues caused tension to build within the Sheriff's Department prior to the 2010 election.

As the primary election of 2010 neared, Plaintiff informed Defendant that he intended to run for Sheriff. (Bennett Dep. 29:5-2-3.) Defendant told Plaintiff that he wished Plaintiff would not run because it would make his bid for re-election more difficult, but that he had no intention of firing Plaintiff for doing so. (Id. at 29:10-18.) Plaintiff stated that he felt obligated to run because had already told so many people that he would do so. (Pierce Dep. 74:17-22.) Following that conversation, both Defendant and Plaintiff filed their candidacy on the first available date. Thereafter, the Sheriff's Department was split between the supporters of each candidate. While neither Plaintiff nor Defendant solicited or requested their co-workers' allegiances, it was clear to everyone concerned that Plaintiff was supported by his step-father Deputy Ron Ooten, and Deputies York and Isaacs, and that Defendant was supported by Deputies McAninch, Bertram, Smith and Whittles and the Department secretary Cathy Johnson.

Although both Plaintiff and Defendant agree that the campaign itself was mild and civil,

(see Pierce Dep. 92:19-21, Bennett Dep. 34:20-35:3 ),the pre-existing friction within the Sheriff's Department was exacerbated as the campaign between Plaintiff and Defendant progressed. While Defendant never mentioned Plaintiff in his own campaign ads, (Bennet Dep. 34:23-25), Plaintiff issued ads that stated he would be a "working Sheriff[,]" (see Pierce Dep. 87: 2-7; Pl.'s Mot. Partial Summ. J., Ex. 7 Pierce campaign advertisement). Along with the "working Sheriff" catchphrase, Plaintiff also issued a campaign ad which stated that he would "maintain an honest working staff that has the same ideas and principles." (Pl.'s Mot. Partial Summ. J. Ex. 6 Pierce campaign advertisement.) Furthermore, throughout the campaign, there were rampant rumors that regardless of which candidate was elected Sheriff that the other candidate's supporters would be fired. (Pierce Dep. 78:16-18, 81:11-16.) Several deputies were concerned and reported to Defendant that Plaintiff had openly told individual supporters that should he win the election, he would give the jobs of those Deputies supporting Defendant to his own supporters. (See Cain Dep. 12:22-25, Smith Dep. 16:15-17, Bertram 42:11-22, McAninch Dep. 18:3-8.)

Defendant won the primary in one of his closest elections to date. (Bennett Dep. 8:19-21.) Despite telling the Plaintiff that he would not be fired, approximately three days after the election, Defendant spoke to Plaintiff on the telephone and told him that he could either resign or be terminated. (See Pl.'s Mot. Partial Summ. J. Ex. 11 Telephone Transcript 1:16-19.) In the telephone conversation, Defendant stated that

> Well, you know - everybody's got a right to run, everybody's got a right to say what they want to say, and that's freedom of speech and everything. But the problem is Pierce - the damage is definitely permanent. I don't think I can serve the public with the friction and everything - the damage that's been done. I mean you gotta have unity - you gotta be able to share information at work and everything. I just think that I wouldn't be able to serve the public the way I should be able to.
> . . .
> The main thing of it is and it's nothing personal to you. It's just I've got a

> department to run and I've got to have unity. . . . If I didn't - I mean - if I didn't - it just wouldn't work. . . . I'm just here to serve the public and they deserve the best I can give them and I can't with a divided department.

(Id. at 2:3-11, 3:13-20.) Plaintiff refused to resign and the Defendant terminated him by certified letter on May 24, 2010. (See Pl.'s Mot. Partial Summ. J. Ex. 12.) In the termination letter, as well as during the telephone conversation, Defendant cited Greenwell v. Parsley, 541 F.3d 401 (6th Cir. 2008), as justification for Plaintiff's termination. (See id.; Telephone Transcript 3:9-11.)

Plaintiff filed the instant suit against Defendant in his individual capacity on September 10, 2010, alleging that he was terminated for exercising his First Amendment freedom of speech rights in violation of 42 U.S. C. § 1983.[1] Plaintiff has also alleged a state law claim for wrongful discharge.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical

---

[1] Although the caption of Plaintiff's various briefs state that Defendant has been sued in his individual and official capacity, the Complaint clearly indicates that Defendant has only been sued in his individual capacity. (See Compl.)

4

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by " showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. DISCUSSION

**A. Retaliation for the Exercise of First Amendment Rights**

Although "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," City of San Diego v. Roe, 543 U.S. 77, 80 (2004), it is clear that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418. While it is true that "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011) (quoting Eu v. San Francisco Cnty. Democratic Central Comm., 489 U.S. 214, 223 (1989), the Supreme Court has found that "[e]ven something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees." Waters v. Churchill, 511 U.S. 661, 672 (1994).

Plaintiff contends that he was terminated by Defendant in retaliation for exercising his First Amendment rights in violation of § 1983. Section 1983 imposes civil liability on a person acting under color of state law who deprives another of the "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." DeSilva v. State Medical Bd. of Ohio, 2010 WL 1644209, at *7 (S.D. Ohio April 23, 2010) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985)). Section 1983 has two basic requirements: "(1) state action that (2) deprived an individual of federal statutory or constitutional rights." Id. (citing Flint v. Ky. Dept. of Corrections, 270 F.3d 340, 351 (6th Cir. 2001)).

In order "to establish a prima facie case of retaliation under 42 U.S.C. § 1983, a plaintiff must show that (1) the plaintiff engaged in constitutionally protected speech; (2) the public employer subjected the plaintiff to adverse action; and (3) the adverse action was motivated by the protected speech." Miller v. City of Canton, 319 F. App'x 411, 416 (6th Cir. 2009). In the public employee setting, a plaintiff attempting to demonstrate the first prong of a prima facie retaliation claim must "meet additional standards to establish that the speech at issue is constitutionally protected." Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). "Specifically, the public employee plaintiff must demonstrate (1) that he was speaking as a citizen addressing matters of public concern; and (2) that his interest in addressing those matters of public concern outweighs his employer's interest 'in promoting the efficiency of the public services it performs through its employees.'" Fitzpatrick v. City of Frankfort, 305 F. App'x 258, 262 (6th Cir. 2008) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "Although there may be factual questions about what expression occurred[,] . . . whether the speech addresses a matter of public concern and the application of the balancing test

are questions of law" for the court to decide. Id.

In Banks v. Wolfe Cnty. Bd. of Educ., 330 F.3d 888 (6th Cir. 2003), the Sixth Circuit described speech on matters of public concern as

> speech relating to "any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983)). . . . "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. In general, speech involves matters of public concern when it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." Brandenburg, 253 F.3d at 898 (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)).

Banks, 330 F.3d at 893.

Looking specifically to political speech, the Sixth Circuit has found that declaring one's candidacy is not speech on a matter of public concern. Carver v. Dennis, 104 F.3d 847, 852 (6th Cir. 1997). "[T]here is no protected right to candidacy under the First Amendment, and a public employee may be terminated because of the fact of that employee's candidacy." Murphy v. Cockrell, 505 F.3d 446, 450 (6th Cir. 2007) (citing Carver, 104 F.3d at 850-51). However, the act of speaking out against a rival candidate in an election is speech on a matter of public concern. Greenwell v. Parsley, 541 F.3d 401, 404 (6th Cir. 2008). The Sixth Circuit has recognized that "cases involving political speech by public employees proceed on a continuum" and that "drawing a clear line between the simple announcement of a candidacy, which does not trigger protected political speech, and an announcement coupled with speech critical of one's opponent (and boss), which does trigger constitutional protection, is not an easy task." Id.

Plaintiff contends that he engaged in constitutionally protected speech on a matter of public concern by actively campaigning for the office of Sheriff. Plaintiff argues that he "raised issues

regarding whether the defendant was a 'working sheriff,' urging the voters to replace him," and that he "made specific, detailed criticisms of office policies and personnel decisions, telling the voters how he would change things for the better." (Pl.'s Mem. Supp. Mot. Partial Summ. J. 11.) While it is unclear exactly what Plaintiff said regarding his intentions to fire other deputies should he win the election, Plaintiff does not dispute that such statements were made. (See Pl.'s Reply Supp. Mot. Partial Summ. J. 3.) Instead, he argues that "[h]is statements that he would change the personnel of the office are also matters of great public concern, since there could be few actions a sheriff could take that are more important than the selection of deputies." (Id.)

The Court has no difficulty finding that Plaintiff's active campaigning and speech regarding the office of Russell County Sheriff was speech on a matter of public concern. The record reflects that Plaintiff engaged in this speech as a private citizen in his spare time away from his job as a Deputy Sheriff. Furthermore, Plaintiff's speech criticizing the current Sheriff, his policies, and the fitness of his deputies and promoting Plaintiff's ideas, initiatives, and changes contained information that was necessary to "enable the members of society to make informed decisions about the operation of their government." Banks, 330 F.3d 893 (internal quotation marks omitted). Accordingly, the Court finds that the speech at issue did address a matter of public concern.

Having found that Plaintiff's speech addressed a matter of public concern, the Court must now balance Plaintiff's interest in engaging in his political speech "against 'the interest of [Defendant], as an employer, in promoting the efficiency of the public services [he] performs through [his] employees.'" Rankin v. McPherson, 483 U.S. 378, 388 (1987) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). In performing the Pickering balancing, pertinent considerations include "whether the statement impairs discipline by superiors or harmony among

co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id.

When examining the Pickering balance, "the [employer's] burden in justifying a particular discharge varies depending upon the nature of the employees's expression." Connick, 461 U.S. at 150. "[I]f an employee's speech 'substantially involved matters of public concern,' an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action." Leary v. Daeschner, 228 F.3d 729, 737-38 (6th Cir. 2000) (citing Connick, 461 U.S. at 150-52)). However, "[w]hen close working relationships are essential to fulfilling public responsibilities," and an employer concludes that an employee's speech interferes with those relationships, "a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-52.

Looking to the circumstances of the instant case, the speech at issue was uttered during a political campaign for public office. Such speech *substantially* involves matters of public concern and, therefore, requires a particularly strong showing by Defendant. However, the Court can think of no public responsibility that requires closer working relationships and trust than that of law enforcement officers. Accordingly, the Defendant's judgment regarding the maintenance of those relationships and the efficient operation of his office is entitled to a wide degree of deference. Keeping these competing interests in mind, the Court will look to the evidence produced regarding the effects of Plaintiff's speech.

The parties agree that a certain amount of friction and tension existed within the Russell County Sheriff's Department prior to Plaintiff's official entry into the election. However, the parties

dispute the degree to which the friction/tension increased after Plaintiff officially engaged in his various campaign activities and the effect such tension had on the operation of the Russell County Sheriff's Department. At his deposition, Defendant testified that the reason he terminated Plaintiff was because

> there was so much disharmony in the department. I didn't have any problems with Mr. Pierce. But I had a department to run. I was elected. I had to serve the people and I had to have a department that can work together and have harmony because in a small department their lives depend on each other. . . . [The Deputies] go to a call, you know they've got to know that that guy is going to be there and they can trust them [sic]. They've got to feel that trust. And as time went on you know that, that trust eroded among the employees.

(Bennett Dep. 41:20-42:8.) Defendant further stated that "it came more evident as time went on and I seen the department, I had to do something to pull the department back together. . . . I mean I had to, I had to have unity." (Id. at 47:1-10.) Defendant testified that the division created within the department was so bad that "right at the end of the election when it was over I mean I had [five] employees saying they were not going to work with Mr. Pierce. . . . If he stayed they were leaving." (Id. at 47:14-23.)

This disharmony and lack of trust was echoed by Deputies on both sides of the divide. Deputy Lee Smith testified that tensions increased after Plaintiff began his campaign and got to the point that Deputy Smith "hated coming to work." (Smith Dep. 14:21-15:2.) Deputy Smith stated that "I saw the department clearly divided. I saw tension every day to where nobody wanted to come to work. I saw [Deputy Ooten] almost drove insane. Myself, you know, coming to work every day, nerves on edge." (Id. at 16:5-9.) As the election continued on, Deputy Smith testified that "it just got worse, and it got progressively worse at a higher rate than it had before until it was unbearable." (Id. at 17:13-15.) Deputy McAninch testified that the tension and issues within the department "got

worse and worse and worse and worse" and that "the closer to the election or whatever, it got worse." (McAninch Dep. 14:14-19.) The working relationships became so bad near the end of the election that "you just didn't know if you had back-up out there." (Id. 15:24-16:2.) Because certain deputies were not receiving the necessary back-up during calls, Deputy McAninch felt the need to work overtime after his shifts to help provide that back-up. (See id. at 13:12-14:13.)

Deputy Nick Bertram was asked about the tension within the department after Plaintiff began actively campaigning and he stated that the tension increased to the point that there were times he "felt like [he] was in a hole." (Bertram Dep. 32:6-9.) Deputy Bertram gave a particularly troubling account of an interaction with Plaintiff and his supporters while on duty:

> I took a guy into the jail and it was like I felt surrounded by [Plaintiff, Deputy York and Deputy Wesley]. . . . They would just be sitting there staring at me, you know trying to intimidate me. And I would, I wouldn't say anything at all, I didn't want to because I knew I would be swarmed if I did so I finished all of my paper work and left. But I mean I felt really uncomfortable, really kind of nervous of what was going to happen but luckily nothing did and I went on and still done my job.

(Id. at 32:11-24.)

These issues identified and testified to by Defendant and his supporters were equally present in the depositions of Plaintiff and his supporters. Plaintiff testified that during the campaign "[i]t was just a lot of tension." (Pierce Dep. 79:25-80:1.) Plaintiff described the department as "split" and that "[i]t made a bad, bad situation." (Id. at 80:20-22, 81:16.) Deputy Carey York testified that "[i]t was kindly [sic] like two sides, you know. . . . There was trust issues there no doubt." (York Dep. 14:21-25.) He further testified that "there was always that little thing that in the back of your head you don't trust . . . and then it just got worse. . . . Basically when Tim filed for Sheriff it got really worse." (Id. at 15:12-17.) When asked for examples of how the department got worse Deputy York cited instances where he did not receive back-up, (id. at 15:21-22), where Defendant's

11

supporters refused to answer calls placed by Plaintiff and his supporters to the Sheriff's Department, (id. at 18:22-19:1), and where he responded to multiple calls while the other deputies on duty could not be found, (id. at 19:8-12).

When Deputy Ron Ooten testified regarding the atmosphere of the Sheriff's Department he stated that "it just got to a point where I just quit coming to the office. I just, you know, if I could stay out of the office, I'd just stay out of the office." (Id. at 44:23-45:1.) After the conclusion of the election, and Plaintiff's termination, Deputy Ooten spoke with Defendant in a meeting and stated that he felt he was being treated "pretty cold." Deputy Ooten told Defendant that he felt many of the other employees in the Sheriff's department had lied during the election and that he could not "work for a bunch of liars." (See id. at 57:7-14.) According to Deputy Ooten, Defendant's response was "its not gonna get any better." (Id. at 57:3-6.) It was at this point that Deputy Ooten told Defendant he intended to resign. (Id. at 57:14-16.) The working relationship between Deputy Ooten and the other deputies had deteriorated to such a degree that Deputy Ooten felt that Deputies Bertram and McAninch needed a "good mash right in the mouth." (Id. at 58:25-59:1.) But rather than fight them, Deputy Ooten "faced Nick Bertram and Clete McAninch, and [he] told them both what [he] thought of them, that they were liars and that for them just to stay out of [his] face." (Id. at 58:4-7.) When he was asked at his deposition why he resigned, Deputy Ooten stated "I wasn't gonna be ridiculed and have to go in [the Sheriff's Office] and do [sic] with what I'd been doing in the last few months." (Id. at 74:23-25.)

Defendant contends that this evidence demonstrates that the tension created by Plaintiff's campaign and political speech had such a negative effect on the operation of his office that he was justified in terminating Plaintiff in order to right the ship. Plaintiff does not dispute that there was

12

tension, but instead claims "[t]here had never been complete harmony in the Sheriff's Department." (Pierce Dep. 91:15-16.) Plaintiff argues that because there had always been tension within the Russell County Sheriff's Department that Defendant cannot claim tension interfered with the efficient administration of the Department only after Plaintiff campaigned against him. While there was some tension within the department prior to Plaintiff's entrance into the election, the record reflects that nearly every person in that department testified that the tension got much worse after Plaintiff began actively campaigning. As Deputy Ooten succinctly stated, although there were always differences present within the department, "the campaign was just fuel to the fire." (Ooten Dep. 64:5-7.) Plaintiff further argues that tension in the workplace is insufficient to justify terminating an employee who maintains an active candidacy against her employer. In support of this argument he cites Murphy v. Cockrell, 505 F.3d 446 (6th Cir. 2007).

    In Murphy, the plaintiff and defendant both worked in the Montgomery County, Kentucky, Property Valuation Administration office. When the incumbent Property Valuation Administrator (PVA) retired, the defendant was appointed interim PVA. In the following election, the plaintiff challenged the defendant for the position of PVA. During the election, the plaintiff attacked the defendant's experience and party affiliation. The defendant was victorious, and shortly thereafter terminated the plaintiff. The plaintiff filed a § 1983 suit contending she was terminated in violation of the First Amendment. On appeal, the Sixth Circuit found that "[t]he only apparent negative impact of Murphy's campaign was the deterioration of her relationship with Cockrell, and the resultant tension in the PVA office." Murphy, 505 F.3d 453. In conducting the Pickering balance, the court found that "supporting a political party or candidate of one's choosing is a fundamental right protected under the First Amendment, and as such, it is impermissible to allow a superior to

13

terminate an employee simply because tensions that did not impede the functions of the workplace arose of such protected speech." Id. (internal citation omitted).

The Court finds that the instant case is distinguishable from Murphy for several reasons, most important of which is the impediment of the workplace functions caused by the Plaintiff's political speech. Murphy holds that "tensions that *d[o] not impede* the functions of the workplace" are insufficient to outweigh the political speech that accompanies an active campaign in an election. Id. (emphasis added.) However, the facts of this case demonstrate not only extreme tension within the Russell County Sheriff's Department, but also that the tension actually impeded the functioning of the department. The excerpts identified above are a glimpse into a department that was permeated with distrust, anger, and dysfunction. The excerpts demonstrate that the working relationships within the Russell County's Sheriff's Department were severely strained and in some instances broken by the tension that resulted from Plaintiff's political speech. The Deputies testified to a lack of trust among each other, which meant they were often left wondering whether they would receive the proper back-up when responding to calls. The record reflects that Deputies attempted to intimidate one another, which led to Deputies avoiding one another, and in at least one instance a Deputy avoiding coming to the Sheriff's office if at all possible. There was testimony that nerves were on edge, and that employees did not want to come to work. Defendant testified that his small department was so divided that had Plaintiff returned to work following the election he feared that many of his employees would seek alternative employment.

In short, this evidence demonstrates that unlike Murphy, the tension and friction caused by Plaintiff's political speech actually impeded the functioning of the workplace. The instant case not only demonstrates tension, but it demonstrates severe dysfunction. That tensions existed prior to

14

Plaintiff's political speech is of no concern to the Court where the record is clear that the political speech magnified and exacerbated those tensions to the point that the department could not properly function. Accordingly, Murphy is distinguishable. The Court finds that the facts of the instant case more closely resemble those of Joyner v. Lancaster, 815 F.2d 20 (4th Cir. 1987).

In Joyner, a highly placed deputy within a Sheriff's department of approximately one hundred and fifty deputies publicly campaigned against the incumbent Sheriff and openly supported the challenger during an election. Id. at 21-22. The deputy's campaigning activities caused friction within the department, and twenty to thirty members of the department reported to the Sheriff that the deputy was "causing pervasive distrust and plummeting morale." Id. at 22. After winning re-election, the Sheriff requested that the deputy resign, and when he refused, the Sheriff terminated him. Id.

> The Fourth Circuit Court of Appeals found that
>
> [t]he rather violent reaction of the other members of the department may have stemmed in substantial part from concern about their own job security and not alone from a sense of loyalty to Sheriff Lancaster, but it was not their concerns that triggered the disruption. The disruption and antagonisms were immediately and directly caused by [plaintiff's] political activity.

Id. at 24. The Fourth Circuit held that "[t]he district court properly weighed the balance and concluded that the sheriff's interest in the effective and efficient fulfillment of his department's responsibilities outweighed [plaintiff's] interest in exercising his First Amendment rights." Id.

The Court recognizes that Joyner is somewhat factually distinguishable from the instant case. First, the plaintiff in Joyner was a high ranking official in a large department, which resulted in his campaigning reaching and pressuring a great deal of deputies within the Department. In the instant case, Plaintiff is simply another deputy in a small department. However, given the small size of the

15

Russell County Sheriff's Department and the necessity for each deputy to interact with and support one another, the Court finds that Plaintiff's campaign activities also reached across and applied pressure to the other employees within the Russell County Sheriff's Department.

Second, while the disruption in <u>Joyner</u> was caused solely by the plaintiff's political speech, in the instant case, there was tension and antagonism within the department that existed prior to Plaintiff's political speech. However, while the Department was able to function notwithstanding the prior tension, Plaintiff's political speech compounded and exacerbated those pre-existing conditions to the point that the department was no longer able to function properly. In this situation, the Court finds the pre-existence of the friction is a distinction without a difference that does not require this Court to reach a different result than that reached in <u>Joyner</u>. Under the circumstances within the Russell County Sheriff's Department described above, the Court finds that the Defendant's need to restore and maintain the efficient operation of his department outweighed the Plaintiff's interest in engaging in his political speech.

Accordingly, the Court finds that the <u>Pickering</u> balance weighs in favor of Defendant and that Plaintiff was not engaged in constitutionally protected speech. Such a finding precludes Plaintiff from establishing a prima facie case of retaliation, therefore, the Court **GRANTS** Defendant's motion for summary judgment as to this claim.[2]

---

[2] The Court gives little weight to Plaintiff's argument that Defendant has consistently given different reasons for the Plaintiff's termination. While Defendant may have misunderstood <u>Greenwell</u> and therefore improperly cited it in termination documents, the record demonstrates that Defendant has consistently stated that disharmony and the need for unity within his Department prompted Plaintiff's termination. (<u>See</u> Pl.'s Mot. Partial Summ. J. Ex. 11 Telephone Transcript 2:3-11, 3:13-20; Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. Def.'s Ans. to Interrog. 5 (citing "impairment of the harmony among co-workers, and the impediments to the proper functioning of the Russell County Sheriff's Department); Bennett Dep. 42:4-16, 43:12-18.)

**C. State Law Wrongful Discharge**

Plaintiff also claims that his termination was in violation of public policy. Although Kentucky is a terminable-at-will state, the Kentucky Supreme Court has recognized that wrongful terminations that violate public policy are actionable. Firestone Textile Co. Div. v Meadows, 666 S.W.2d 730, 731 (Ky. 1983). In order to succeed under such a claim, a plaintiff must show that he was discharged "contrary to a fundamental and well-defined public policy as evidenced by existing law" and that "[t]he public policy [is] evidenced by a constitutional or statutory provision." Id. (citation omitted). "Whether a public policy is fundamental, well-defined, and evidenced by existing law is a question for the court to decide." Mitchell v. Coldstream Lab., Inc., 337 S.W.3d 642, 645 (Ky. Ct. App. 2010).

In Gryzb v. Evans, 700 S.W.2d 399 (1985), the Kentucky Supreme Court adopted the holding of the Michigan Supreme Court in Suchodolski v. Mich. Consolidated Gas Co., 316 N.W.2d 710 (Mich. 1982), and found "that only two situations exist where 'grounds for discharging an employee are so contrary to public policy as to be actionable' absent 'explicit legislative statements prohibiting the discharge[:]'" (1) where the alleged reason for the discharge of the employee was the employee's failure or refusal to violate a law in the course of employment; or (2) when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment. Gryzb, 700 S.W.2d at 402 (quoting Suchodolski, 316 N.W.2d at 711-12)).

In the instant case, the first ground for discharge is not at issue, as there are no allegations that Plaintiff was discharged for refusing to violate a law. Rather, Plaintiff alleges that the fundamental and well-defined policy upon which he relies for his wrongful discharge claim is "his right to free speech under the First Amendment of the United States Constitution." (Compl. ¶ 26.) However, the Court has already found that Plaintiff was not engaged in constitutionally protected speech.

17

Therefore, there is no evidence that Plaintiff was discharged for exercising a right conferred by well-established legislative enactment. Accordingly, the Court finds no genuine dispute of material fact regarding this claim and **GRANTS** Defendant's motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** Defendant Larry Bennett's Motion for Summary Judgment [DN 34] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff Tim Pierce's Motion for Partial Summary Judgment [DN 35] is **DENIED**.

cc: counsel of record